FILED

AO 91 (Rev. 11/11) Criminal Complaint      APR 14 2021     AUSA Albert Berry III (312) 886-7855

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE MARIA VALDEZ
UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KALIL WARNER | CASE NUMBER:<br><br>**21 CR 228** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about January 25, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

*Code Section*

Title 18, United States Code, Section 922(o)(1)

*Offense Description*

did knowingly transfer and possess a machinegun as it is defined in Title 26, United States Code, Section 5845(b)

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____
THOMAS SPRATTE
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: April 14, 2021              _____
                                                        *Judge's signature*

City and state: Chicago, Illinois        MARIA VALDEZ, U.S. Magistrate Judge
                                                             *Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, THOMAS SPRATTE, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since August 2019. Prior to becoming a Special Agent with ATF, I was a law enforcement officer with the Blue Island and Chicago Police Department for eight years. My current responsibilities include the investigation of firearms offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that KALIL WARNER has violated Title 18, United States Code, Section 922(o)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WARNER with knowing transfer or possession of a machinegun, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and my review of pertinent documents and recordings.

## I. APPLICABLE LAW

4. Title 18, United States Code, Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun," and section 921(a)(23) states that "the term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. § 5845(b))."

5. Title 26, United States Code, Section 5845(b) defines a "machinegun" as "any weapon which shoots … automatically more than one shot … by a single function of the trigger." The definition further includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."

6. Based upon my training and experience and the training and experience of other agents with whom I have consulted, I am aware of conversion devices that have been designed and created for the sole purpose of converting semiautomatic Glock pistols into fully automatic machineguns. These devices vary by design and appearance, but all, when properly installed on a semiautomatic Glock pistol, will allow the firearm to expel more than one projectile by a single pull of the trigger. Installation of these Glock Conversion Devices usually requires no technical expertise and is completed by removing the polymer slide cover plate on a Glock semiautomatic pistol and replacing it with a Glock Conversion Device. I also know that these devices are referred to by different names, including but not limited to, "Glock switches," "auto sears," "convertors," "conversion switches," "selector switches," or simply "switches." The Glock Conversion Device is a prohibited item under the National

Firearms Act, 26 U.S.C. § 5845(b), because it is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."

## II. FACTS SUPPORTING PROBABLE CAUSE

7. As set forth more fully below, since in or around January 2021, by and through an undercover officer, ATF has purchased 32 Glock Conversion Devices from KALIL WARNER and, on one occasion from a co-conspirator ("CC-1") on behalf of KALIL WARNER.

*The January 25, 2021 Controlled Purchase*

8. On January 22, 2021, a confidential source ("CS") introduced an undercover agent ("UCA") to WARNER.[1] On that date, at the direction of the ATF, the CS purchased a Glock Conversion Device from WARNER for $300. The UCA accompanied the CS to that purchase and observed it.

9. On or about January 25, 2021, the CS provided the UCA with a phone number for WARNER: (312) XXX-7007 ("the 7007 number"). On or about January 25, 2021, the UCA sent a text message to the 7007 number requesting information about the purchase of "Glock switches." During the text message exchange, WARNER

---

[1] The CS has provided law enforcement with reliable information since January of 2019. The CS was signed up through ATF as an informant from January 2019 through deactivation in December 2019. The CS was reactivated in February 2020 and has been active to date. Prior information provided by the CS has been corroborated by seizures of firearms, recorded conversations, and controlled purchases of firearms. To date, ATF has paid the CS a total of approximately $1,800.

Following the January 22, 2021 transaction, law enforcement showed the CS and the UCA a known photograph of WARNER and both the CS and the UCA identified WARNER as the individual that sold him the Glock Conversion Device on January 22, 2021.

3

agreed to meet the UCA at 5:30 p.m. in a grocery store parking lot located on N. Des Plaines Street in Chicago to sell the UCA ten "Glock switches."[2] Later in the day, the UCA texted WARNER "At the spot [the grocery store parking lot]."[3] WARNER responded, "Ight bet give me 5 mins [OK. I'll be there in 5 minutes]." The UCA replied "Coo [OK]." WARNER then sent a text message "Pullin up [Pulling up in my car]."

10. According to UCA, and as confirmed by the audio/video recording, at approximately 5:43 p.m., WARNER parked his vehicle, a red Saturn, in the grocery store parking lot close to the UCA's vehicle. The UCA observed WARNER turn the light on in his vehicle then retrieve a clear plastic bag from the center console. At approximately 5:46 p.m. WARNER exited his vehicle and got into the passenger seat of the UCA's vehicle. WARNER retrieved multiple clear plastic bags from the front pocket of his sweatshirt, handed the UCA a balled-up piece of paper containing several small metal pins, and gave the UCA a clear plastic bag with what appeared to be plastic components. WARNER told the UCA that the bag should contain eleven total switches and that he "had thrown in an extra switch for free." After the UCA inspected the bag and its contents, he handed WARNER $2,500 of pre-recorded ATF funds for the Glock Conversion Devices. The UCA asked WARNER about the

---

[2] Law enforcement has identified WARNER as the user of the phone number ending in 7007 based on the following: (1) WARNER is the listed subscriber for the phone number ending in 7007; (2) The UCA, who had previously spoken to WARNER in person, recognized the voice answering the phone ending in 7007 as WARNER; and (3) after texts with the phone number ending in 7007 selecting places to meet, WARNER appeared to make the transactions.

[3] My understanding and/or interpretation of text messages, which is contained in the brackets, is based on information received from law enforcement personnel, my knowledge derived from this investigation, and my experience and familiarity with gun trafficking.

4

possibility of future purchases. WARNER replied that he had an additional 50 switches. The UCA told WARNER that the UCA was willing to purchase the rest. WARNER told the UCA that WARNER received switches "every few days." The UCA asked if WARNER could save the remaining switches so that the UCA would purchase them two days later. WARNER told the UCA, "Yeah, I'm gonna get some more just hit me." WARNER then exited the UCA's vehicle and returned to his vehicle.

11. On January 28, 2021, the devices purchased on January 22 (one white Glock Conversion Device) and January 25 (parts for eleven black Glock Conversion Devices) were examined and tested by personnel at ATF's Firearm Technology Criminal Branch in Martinsburg, West Virginia. According to the reports, when the white Glock Conversion Device was installed on a Glock semiautomatic firearm, it caused the firearm to fire more than one round after a single pull of the trigger. According to the same report, the eleven black Glock Conversion Devices consisted of several parts (12 back plates, eleven selectors, and eleven "legs"). According to the reports, when four of the black Glock Conversion Device were assembled and installed on a Glock semiautomatic firearm, they did not cause the firearm to fire more than one round after a single pull of the trigger because one pull of the trigger caused the "leg" to sustain damage. However, simply replacing the "leg" with one of higher quality, would allow the Glock semiautomatic firearm to fire more than one round after a single pull of the trigger.

12. The ATF concluded that each of the devices was a machinegun, in that the devices were designed and intended for use in converting a weapon into a machinegun.

*The January 27, 2021 Controlled Purchase*

13. According to the UCA, on or about January 26, 2021, at approximately 7:30 a.m., WARNER texted the UCA from the 7007 number stating, "40 [Glock switches] left want me to hold em for you or what?" The UCA responded, "ya I come thru tomorrow if you can lockem down [hold them until I arrive]." At approximately 8:20 a.m., the UCA texted WARNER on the 7007 number and stated, "Yo you try these out bro? [have you tested the Glock switches]." WARNER replied, "Always what's the problem?" The UCA responded, "It hit full auto or what? [Do they switch a semiautomatic to fully automatic?] That white one straight but the black aint hittin [The white one works but the black ones do not work.]."[4] WARNER responded, "Yea you clicked it over" and "The tube, switch button should be the last part that goes in [instructing the UCA how to assemble the Glock switches]." The UCA asked WARNER, "Whats the ticket on 40? [How much for 40 Glock switches]." WARNER responded, "10k [$10,000]". The UCA asked, "We good for tomorrow but trying to slide around 2bro tryin get back north before traffic [Are we still on for tomorrow around 2:00 p.m. I want to get back north before there is too much traffic.]." and "Wtw [What's

---

[4] On January 22, 2021, WARNER sold the UCA one white switch and on January 25, 2021, WARNER sold the UCA 11 black switches.

6

the word] bro we locked in? [Are we still on for tomorrow?]" WARNER replied, "yea ima call you".

14. On January 27, 2021 (the next day), at approximately 10:13 a.m., WARNER called the UCA from the 7007 number, and, during the call, WARNER agreed to meet the UCA later that day at the same grocery store parking lot 2:00 p.m. to sell the UCA the Glock Conversion Devices. On the call, the UCA and WARNER discussed the price of the "Glock switches." WARNER stated the price had been raised to $450 a switch. At approximately 10:55 a.m., WARNER sent a text to the UCA that stated, "I only got 10 with me today my brother coming from out of town with rest I can do the 10 for 3,000 and ima let you know when the rest in." WARNER and the UCA agreed to meet at the same location as the previous purchase to exchange ten Glock switches for $3,000.

15. At approximately 2:03 p.m., the UCA sent a message to WARNER on the 7007 number and advised WARNER that he had arrived. At approximately 2:12 p.m., WARNER arrived driving the same car that he drove to the January 25 transaction and parked in front of the UCA's vehicle. WARNER exited his vehicle, walked to the passenger side of the UCA's vehicle, and got into the front seat. According to the UCA, and as confirmed by the audio/video recording, once inside the UCA's vehicle, WARNER retrieved a white plastic bag from his pocket and handed it to the UCA. The UCA placed the bag on the center console and inspected the contents. According to the UCA, the bag contained the components to assemble conversion switches. The UCA inspected the pieces and noticed that the metal pins were missing.

When the UCA asked WARNER about the missing metal pins, WARNER told the UCA that he wouldn't have the pins until the following day. WARNER stated words to the effect of, "You don't need the pin to do it." WARNER further stated words to the effect of, "It goes in with the Glock and the sear."

16. At approximately 2:15 p.m., WARNER exited the UCA's vehicle, returned to his vehicle, retrieved an unknown item from inside of his vehicle, and returned to the UCA's vehicle. Once inside the UCA's vehicle, WARNER handed the UCA a fully assembled Glock Conversion Device. The UCA inspected the device and told WARNER he was willing to purchase all the switches for "two stacks [$2,000]" and WARNER agreed. The UCA handed WARNER $2,000 in pre-recorded ATF funds. The UCA asked WARNER if WARNER had more switches. WARNER told the UCA "We got 40 coming in Friday or Saturday." The UCA told WARNER he would try the switches without the pin. WARNER stated, "I know for a fact because my cousin just did it yesterday." The UCA asked WARNER how the switches operated when he tried them. WARNER told the UCA, "I just get them, then give them to other people." WARNER further stated, "My brother shot a whole clip out [WARNER's brother fired fully loaded magazine through a firearm with a mounted conversion switch]." WARNER told the UCA that his brother would be back this weekend and could further explain the operability of the conversion switches to the UCA.

*The February 3, 2021 Controlled Purchase with Co-conspirator*

17. On February 2, 2021, the UCA contacted WARNER on the 7007 number and arranged a February 3, 2021 purchase of twelve Glock Conversion Devices for

8

$2,000 at the same grocery store parking lot location where the UCA and WARNER previously met.

18. According to the UCA, on February 3, 2021, at approximately 1:57 p.m., the UCA sent a message to WARNER on the 7007 number and advised WARNER that the UCA had arrived. At approximately 2:00 p.m., WARNER responded, "ok." At approximately 2:08 p.m., the UCA received a text message from WARNER stating, "finna have my bro pull up [I'm going to ask my "brother" to go see you]."

19. At approximately 2:05 p.m., surveillance units observed WARNER and CC-1 exit WARNER's place of employment. At approximately 2:08 p.m., WARNER and CC-1 entered a blue Hyundai SUV and drove to the corner of N. Des Plaines and W. Kinzie where CC-1 exited the vehicle and walked towards the grocery store parking lot.

20. According to the UCA, and as confirmed by the audio/video recording, at approximately the same time law enforcement observed CC-1 walking towards the parking lot, the UCA received a call from 773-XXX-2578 asking the UCA where the UCA was parked. CC-1 then approached the UCA's vehicle and stood outside on the driver's side.

21. According to the UCA, and as confirmed by the audio/video recording, once CC-1 got to the front driver's side of the UCA's vehicle, the UCA told CC-1 that "he [WARNER]" had "12 [conversion switches]" for sale. CC-1 told the UCA that he only had 10 conversion switches. CC-1 then asked the UCA how much the UCA was supposed to pay for the switches. The UCA told CC-1 the price was supposed to be

"two stacks [$2,000]." CC-1 then retrieved a clear plastic bag from his jacket pocket and handed it to the UCA. The UCA inspected the bag and noticed that there were only components to fully assemble two conversion switches and pieces for a third.

22. According to the audio/video recording and the UCA, later in the conversation, CC-1 asked the UCA how much the UCA would pay for the switches. The UCA informed CC-1 that the UCA would only pay $600 because only two of the switches would function and because CC-1's brother (WARNER) owed the UCA from the last deal. CC-1 agreed and stated that he would relay that to WARNER. The UCA then handed CC-1 $600 in pre-recorded ATF investigative funds. In exchange, CC-1 gave the UCA various components sufficient to make two full conversion switches.

23. On March 3, 2021, the devices purchased on January 27 and February 3 were examined and tested by personnel at ATF's Firearm Technology Criminal Branch in Martinsburg, West Virginia. According to the report, the Glock Conversion Devices consisted of several parts (13 back plates, eight selectors, and ten "legs"). According to the reports, when four of the Glock Conversion Device were assembled and installed on a Glock semiautomatic firearm, it did not cause the firearm to fire more than one round after a single pull of the trigger because one pull of the trigger caused the "leg" to sustain damage. However, simply replacing the "leg" with one of higher quality would allow the Glock semiautomatic firearm to fire more than one round after a single pull of the trigger.

24. The ATF concluded that each of the devices was a machinegun, in that the devices were designed and intended for use in converting a weapon into a machinegun.

### III. CONCLUSION

25. Based on the foregoing facts, I respectfully submit there is probable cause to believe that KALIL WARNER violated Title 18, United States Code, Section 922(o)(1), in that WARNER did knowingly transfer and possess a machinegun as it is defined in Title 26, United States Code, Section 5845(b), on or about the aforementioned dates.

FURTHER AFFIANT SAYETH NOT.

_____
THOMAS SPRATTE
Special Agent, Bureau of Alcohol, Tobacco,
Firearms & Explosives

SWORN TO AND AFFIRMED by telephone on April 14, 2021.

_____
Honorable MARIA VALDEZ
United States Magistrate Judge

11